## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## FLORIDA
### Tallahassee Division

HOWARD L. TAYLOR, Sr.
and SONYA R. TAYLOR,
     Plaintiffs,

v.                                                  CASE NO: 4:20-CV-00059-AW-MJF

FARM CREDIT OF NORTHWEST
FLORIDA, ACA
      Defendant.

_____/

### PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO FARM CREDIT OF NORTHWEST FLORIDA, ACA'S MOTION FOR SUMMARY JUDGMENT, RULE 56(D) MOTION TO DENY OR DEFER SUMMARY JUDGMENT AS PREMATURE AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, HOWARD L. TAYLOR, SR. and SONYA R. TAYLOR, file this combined Response in Opposition ("Response") to Defendant's Motion for Summary Judgment ("MSJ") [Doc. No. 49], Rule 56(d) Motion to Deny or Defer Summary Judgment as Premature ("Motion") and Incorporated Memorandum of Law ("Motion") and say:

### INTRODUCTION

The Defendant has moved for summary judgment on all claims, alleging that the undisputed material facts show that the Taylors: 1) cannot establish that they were qualified for the loan sought from Defendant; 2) cannot identify comparators

1

who were treated more favorably; 3) cannot establish discriminatory animus; 4) cannot establish damages; and 5) cannot obtain relief because the loan transaction is not governed by Chapter 760.20 *et seq.* Florida Statutes. …" [Doc. No. 49]. Although the Taylors assert that Rule 56(d) applies to the MSJ, *in toto*, the Taylors bifurcate and respond as set forth below rather risk partial summary judgment entered against them based on a finding that *some* portions of the MSJ did not fall under the ambit of the Motion.

## Rule 56(d) Motion to Deny or Defer Summary Judgment as Premature

### Standard

Fed. R. Civ. P. 56(d), provides "[i]f a nonmovant shows by affidavit or declaration[1] that, for specified reasons, it cannot present facts essential to justify its opposition, the court may ... defer considering the motion or deny it[.]" To defeat the MSJ, the Taylors must present affirmative evidence showing a genuine issue of material fact, "even where the evidence is likely to be within the possession of the defendant." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). However, this general rule only holds true so "long as the plaintiff has had a full opportunity to conduct discovery." Id. see also Snook v. Tr. Co. of Georgia Bank of Savannah, N.A., 859 F.2d 865, 870 (11th Cir. 1988) ("This Court has often noted that summary judgment should not be granted until the party opposing the motion has had an

---

[1] The Declaration of the undersigned is attached as Exhibit E.

adequate opportunity for discovery." "[T]he whole purpose of discovery in a case in which a motion for summary judgment is filed is to give the opposing party an opportunity to discover as many facts as are available and he considers essential to enable him to determine whether he can honestly file opposing affidavits." Jackson v. Red Hills Oral & Facial Surgery, PA, Jackson v. Red Hills Oral & Facial Surgery, PA, 4:19-CV-88-AW/MJF, 2020 WL 1124764 (N.D. Fla. Jan. 14, 2020), report and recommendation adopted sub nom. Jackson v. Red Hills Oral & Facial Surgery, P.A., 4:19-CV-88-AW-MJF, 2020 WL 1078760 (N.D. Fla. Mar. 6, 2020).

Fed. R. Civ. P. 56(d) is liberally construed to allow district courts to ensure the parties have been given a reasonable opportunity to make their record complete before ruling on a motion for summary judgment and it is within the sound discretion of the district judge to grant a continuance under Fed. R. Civ. P. 56(d). Wallace v. Brownell Pontiac-GMC Co., Inc., 703 F.2d 525, 528 (11th Cir. 1983). To invoke the protection of Fed. R. Civ. P. 56(d), the nonmoving party must explain: "(1) what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what effort the affiant has made to obtain them; and (4) why the affiant was unsuccessful in these efforts." Hickman v. Wal-Mart Stores, Inc., 152 F.R.D. 216, 221 (M.D. Fla. 1993), aff'd, 58 F.3d 640 (11th Cir. 1995). Finally, "there is nothing to suggest that Plaintiff's failure to conduct discovery was due to inactivity or delay." Estate of Todashev by Shibly

v. United States, 815 Fed. Appx. 446, 454 (11th Cir. 2020) (citing to Walters v. City of Ocean Springs, 626 F.2d 1317, 1321 (5th Cir. 1980))("Unless dilatory or lacking in merit, [a Rule 56(d)] motion should be liberally treated."); Id. at 1322 ("The most common situation in which Rule 56[ (d) ] will not be applied to aid a nondiligent party arises when the nonmovant has complied with Rule 56[(d)] but has failed to make use of the various discovery mechanisms that are at his disposal or seeks a continuance of the motion for that purpose.").

## Argument

On May 12, 2020, the Taylors' initial complaint was dismissed with leave to file an amended complaint. [Doc. No. 18]. In dismissing, the Court referenced that the complaint only "included vague and general claims that minority credit applicants do not fare well with Farm Credit Florida; that the Taylors do not know of any non-minority potential borrowers denied under the same circumstances." [Doc. No. 18:8]. The Court referenced Arafat v. Sch. Bd. of Broward County, 549 Fed. Appx. 872 (11th Cir. 2013), to identify the need for valid comparators as the case proceeds. See Arafat, 549 Fed. Appx. at 874. Farm Credit moved to dismiss the Taylors' amended complaint on June 16, 2020 [Doc. No. 22] arguing:

"The Taylors assert loans made to white borrowers far exceed loans made to black borrowers based on the number of successful loans made to white borrowers versus black borrowers. **However, the statistics relied upon by the Taylors are meaningless without knowing the number of applications Farm Credit received for loans from both non-black borrowers and black borrowers**. … Because the Taylors have failed to identify the number of black and non-black applicants who

applied for loans in 2018, 2019, and 2020**, no reasonable inferences can be drawn from the number of loans actually made by Farm Credit**. … Further, **in the absence of any comparators**, the Taylors may be able to establish a viable claim if they can show the identified decision-maker had a discriminatory motive. [Doc. No. 22]

Meanwhile before the Court ruled on the Defendant's second motion to dismiss, the parties engaged in discovery via interrogatories and requests for production. On September 18, 2020, Plaintiffs served their First Request for Production To Defendants ("First RFP"), attached as Exhibit A. The First RFP specifically included a request for comparator information. On October 30, 2020, Defendant's served their response to the First RFP which stated:

"Farm Credit objects to the request on grounds that the request is vague, overbroad, and unduly burdensome. The request is vague with respect to the portion seeking "all documents necessary to fully understand the contents of all electronic data produced," which is subjective and does not reasonably advise as to the documents sought. The request is overbroad and unduly burdensome as Plaintiffs appear to ask for data related to every loan originated over the last three years without regard to whether or not the loan has anything to do with the pleadings, whether or not the individuals are comparators to Plaintiffs, whether or not the individuals are similarly situated to the Plaintiffs, whether or not the individuals had prior bankruptcies like the Plaintiffs, whether or not the individuals had similar credit scores to the Plaintiffs, whether or not the individuals debt to income ratio was similar to the Plaintiffs, or whether the amount of the loan relative to the individual's income was similar to Plaintiffs. Plaintiffs cannot demonstrate that the breadth of the documents sought are relevant to a claim or defense, the documents have a tendency to make a fact more or less probable, or the request is proportional to the needs of the case."

While the parties attempted to resolve Defendant's objection to this request at a good faith conferral, the parties could not reach an agreement. To the Defendant's credit, though, some documents were produced, including items such as documents

5

and applications that the Taylors provided to the Defendant, bits and pieces (generous characterization) of the Defendant's credit and underwriting policies; and a handful of internal emails. On January 6, 2021, the Court entered an Order Granting in Part Defendant's Motion to Dismiss [Doc. No. 27]. The Court noted that the amended complaint alleged new facts, notably that the Taylor's alleged that "although Farm Credit told the Taylors their past bankruptcies were problematic, it made loans to white borrowers with past bankruptcies (identifying several examples). And, it alleges, the vast majority of all Farm Credit's loans are to white borrowers …" [Doc. No. 27:2-3]. The Court then informs that comparator evidence is part of the Taylors' prima facie case and not considered at the pleading stage. On February 3, 2021, the Taylors filed their second amended complaint [Doc. No. 36] comprised of three counts: Count I- Violation of the Equal Credit Opportunity Act of 1972; Count II – Violation of 42 U.S.C.A. § 1981; and Count III – Violation of § 760.20, Fla. Stat. Ann.. *et seq*. which, amongst other things, added significant statistics the Taylors derived directly from public records showing an undeniable imbalance in loans made to white borrowers versus loans made to every other racial group the Defendant made real estate loans to since January 1, 2010. The Taylors alleged that between January 1, 2010 and May 4, 2020, the Defendant loaned:

> "$346,560,713 to borrowers where the loans were secured by real estate mortgages. The loans were made to 2011 white or white owned business borrowers and 38 black or black owned business borrowers. The 2011 white borrowers borrowed $339,881,949 (98.07% of the total

amount loaned) while the 38 black borrowers borrowed $2,320,370 (.67% of the total amount loaned).

[Doc No. 30:22].

When asked in deposition about its specific denial to this allegation in its answer, the Defendant admitted that it had no facts or documentation evidencing that the allegation was false, nor did it have any documents supporting the contention that the allegation was false. [Doc. No. 48-9:83, 84-86].

On April 9, 2021, the Taylors served their second request for production on Defendant attached as Exhibit B. The Taylors narrowed their request and requested certain account and underwriting data for loan applicants going back five years. The request asked for the following information as to each loan applicant:

    a.  the date of the Loan Applicant's application;

    b.  The Loan Applicant's credit score and/or credit tier assigned;

    c.  The Loan Applicant's bankruptcy history;

    d.  The Loan Applicant's race or ethnicity;

    e.  The Loan Applicant's combined debt-to-income ratio;

    f.  The Loan Applicant's combined loan-to-value ratio;

    g.  The Loan Applicant's "Equity Ratio"

    h.  The Loan Applicant's total gross monthly income;

    i.  The Loan Applicants collateral and statement of value;

    j.  The Loan Applicant's education;

k.  The Loan Applicant's occupation or profession;

l.  Whether the Loan Applicant's Loan was approved or denied;

m. Whether the Loan Applicant was an existing patron or customer or account holder at the time the Loan Applicant's Loan application;

n.  Whether the Loan Applicant's Loan application contained any exceptions to any of Farm Credit's lending policies and procedures or credit weakness as defined in Farm Credit's lending policies and procedures; and how such exceptions were mitigated or not mitigated; and

o.  If under paragraph n immediately above, Farm Credit mitigated any exceptions to any of Farm Credit's lending policies and procedures or credit weaknesses as defined in Farm Credit's lending policies and procedures, how such exceptions or credit weaknesses were mitigated.

On May 10, 2021, the Defendant served its response to the Taylors' second request for production asserting that the request was overbroad, unduly burdensome and not proportional to the case and further that the information sought was irrelevant. See Exhibit C. The Defendant did not try to respond to any of the requests. On May 13, 2021, the Taylors filed a Motion to Compel Discovery [Doc. 41] explaining that they have been frustrated in their attempts to obtain proper discovery to locate, among other things, proper comparator evidence. The Taylors explained why they needed the information and why it was discoverable. Finally, the Taylors advised the Court that numerous depositions, including those of corporate representatives, were scheduled for completion before the discovery cutoff of June 7, 2021 and that the documents were necessary for meaningful depositions. The Taylors requested an expedited hearing and that the Defendant be ordered to produce

all responsive documents, along with an extension of the discovery cutoff date proportionate to the time taken by the Defendant to make proper production plus sufficient time afterward to prepare for the depositions. Despite the Taylors' efforts to explain why their requests were necessary and the Defendant's objections unconvincing, the Motion to Compel was denied on June 15, 2021, seven days after the expiration of the discovery deadline and the completion of the depositions.

In denying the Motion to Compel, the Court found the Taylors' production request was "overbroad, unduly burdensome, and not proportional to the needs of the case." The Taylors respectfully disagree. Here, the Taylors must make a sufficient factual showing to permit a reasonable jury to rule in their favor. Proving discrimination, particularly in credit transactions, may be done in a variety of ways:

a.     Through the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1217 (11th Cir. 2019); Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) ("establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."). As the en banc Eleventh Circuit has explained, when proceeding under McDonnell Douglas, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by

showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably. This last prong, in vernacular, is comparator evidence. The standard for comparator evidence is similarly situated in all material respects, which is "to be worked out in a case-by-case basis." Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019);

b.     Through a "convincing mosaic" of circumstantial evidence. Lewis v. City of Union City, Georgia, 934 F.3d 1169, 1185 (11th Cir. 2019) ("Among other things, a proper comparator simply may not exist in every workplace. Accordingly, a "plaintiff will always survive summary judgment if he presents ... 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'") Id. "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis, 934 F.3d at 1185.

c.     Other courts have thrown wrinkles into McDonnell Douglas designed specifically for credit discrimination cases. Cherry v. Amoco Oil Co., 490 F. Supp. 1026 (N.D. Ga. 1980) (using the effects test for disparate impact framework, which

the Taylors may utilize); <u>Anderson v. Wachovia Mortg. Corp.</u>, 621 F.3d 261 (3d Cir.

2010):

> "In order to make out a prima facie case of lending discrimination in a § 1981 case, a plaintiff must show (1) that he belongs to a protected class, (2) that he applied and was qualified for credit that was available from the defendant, (3) that his application was denied or that its approval was made subject to unreasonable or overly burdensome conditions, and (4) that some additional evidence exists that establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent."

Accord <u>BNT Ad Agency, LLC v. City of Greensboro</u>, 837 Fed. Appx. 962 (4th Cir.

2020) ("Having considered the applicability of various burden-shifting frameworks

utilized in the lending context, we conclude that the district court properly held

that 42 U.S.C.A. § 1981 sets forth the nature of the showing to be made to establish

a prima facie case in a § 1981 lending discrimination case.") *see also* <u>Sallion v.</u>

<u>SunTrust Bank, Atlanta</u>, 87 F. Supp. 2d 1323 (N.D. Ga. 2000) ("When adjusted to

fit the context of the case sub judice, the framework is as follows: [Sallion] must

first make out a prima facie case by showing: "1) that [s]he is a member of a

protected class; 2) that [s]he applied for and was qualified for a loan from the

defendant; 3) that the loan was rejected despite h[er] qualifications; and 4) that the

defendant continued to approve loans for applicants with qualifications similar to

the plaintiffs."). For their § 1981 claim, the Taylors have the additional burden of

showing that race was a *but-for* cause of the discrimination, not merely a motivating

factor. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1014 (2020).

Each of the foregoing require the Taylors to prove they were qualified for the loan they sought and some level of comparator evidence, thus the Court should have ordered production of the loan files for three primary reasons, the first and second of which are more fully explained in the undersigned's Declaration: First, to locate comparator evidence. Second, to obtain proof that the Taylors were qualified for the loan they sought by eliminating the ambiguous and ever-changing (depending on who is giving the explanation) reasons for denial. Third, to validate the statistical evidence compiled by the Taylors and establish their statistical significance to show discriminatory intent and/or to utilize the statistics under Lewis II, Cherry, Andersen or BNT as additional evidence. At deposition, the Defendant admitted it retained loan applicant files where the loan request was at some point denied, "Q. What's in the files?" "A. We do keep a database of all of the adverse actions that go out, the actual form, files, what all would be in our regular loan files." "Q. So if there was an application, that would be in there?" "A. Yes." [Doc. 48-9:91-96]. These files were never produced to the Taylors despite their relevance and informational value. The Defendant also admitted at deposition that it had files for all loans made since 2015, at which time the Defendant enacted a policy which required a copy of photo identification for real estate loans. [Doc. 48-9:81-85]. These files were also never

produced to the Taylors despite their relevance and informational value. The two sets of files, when coupled, form the universe of documents that the Taylors need to prove their case. As the Court noted, "The raw figures [statistics alleged by the Taylors in their amended complaint] do not report, for example, what percentage of loan *applicants* [emphasis in original] were black. So despite the relatively small number of black borrowers, it may be that black applicants are approved as a *higher* [emphasis in original] rate than white applicants – the numbers simply don't say." [Doc. No. 27:4]. The Court is spot-on and the only way to satisfy the Court's open observation is through the analysis of the applicant and loan files in the *sole custody and control of the Defendant.* There is no other possible way to do it. If the Defendant is to be believed when it says that blacks do not apply for loans, the applicant files and the loan files should bear that out. The Court may be right, that is, blacks may not apply or may get approved at a rate higher than whites or some other explanation may exist. But, what if the reverse is true and fifty, or sixty or eighty or ninety percent of the denied applicants were black or some other minority. The only way to confirm that is to review the loan and applicant files. At deposition, the Defendant made much to-do about having the files the Taylors needed, but there was no racial data in them. Even if that were true, which it is not, it does not matter because there is more than one way to skin that cat. The Taylors viewed every single mortgage recorded where the Defendant was a lender since January 1, 2010. From

those public documents, the Taylors derived the loan amount, the location of the collateral, the borrower's address, the corporate structure and officers of corporate borrowers and *most important* the race of every single borrower that has ever held a drivers license in the State of Florida. Thus, the Defendant is not to be believed when it says that none of the files are of any value because there is no box to be checked on any document which indicates race or that a closing agent may have forgotten to get a copy of a photo identification when documents were being notarized.

Through no fault of their own, the Taylors have been denied the opportunity to fully and fairly discover material directly relevant to and necessary for their claims because of the Defendant's refusal to produce documents. The discovery process depends on the parties participating in good faith, which the Defendant has not done. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Although the Court found differently, the Taylors do not believe their requests overbroad, unduly burdensome or out of proportion. Based on the information that the Taylors have compiled, the Defendant has nearly exclusively loaned to whites only during the past ten years. In fact, there are several years where the Defendant did not make a real estate loan to a single black borrower, full stop. This is especially suspect given that some counties where the Defendant does business have a majority population made up of racial minorities. Thus, the Taylors

requests should not strike the Court as offensive because if the Court looks at what the Taylors actually asked for, it will see that the substance of each request and how it applies. For example, the Taylors learned at deposition that not every "ratio" applies to every loan or every borrower. But, there is no way to tell how and which "ratios" were properly applied to the Taylors, in terms of being qualified for the loan they sought, without looking at other loan files. That is the type of information that goes directly to the elements that the Taylors bear the burden of proving at trial. Over the course of a week, the Taylors deposed (without the benefit of discovery) two corporate representatives, the chief lending officer, the chief credit officer, the east region lending manager, a member of the board of directors that served as the chief executive officer of the Credit Review Committee, a loan underwriter and a lending officer. Essentially the who's who of the Defendant and between those witnesses hardly a consistent answer on loan policy, underwriting guidelines and criteria, borrower eligibility, and the interplay between the Defendant and guaranteed lending was given. The Supreme Court has stressed on multiple occasions the need to construe the Rules liberally to allow for robust discovery. Akridge v. Alfa Mut. Ins. Co., 1 F.4th 1271 (11th Cir. 2021) citing Hickman v. Taylor, 329 U.S. 495, 506 (1947) (advising that "the discovery provisions are to be applied as broadly and liberally as possible"); *see also* Schlagenhauf v. Holder, 379 U.S. 104, 114 (1964) (beginning its analysis "with

the basic premise 'that the deposition-discovery rules are to be accorded a broad and liberal treatment' "). And since the Rules "strongly favor full discovery whenever possible," Republic of Ecuador v. Hinchee, 741 F.3d 1185, 1189 (11th Cir. 2013), a civil litigant is generally entitled to "any information sought if it appears reasonably calculated to lead to the discovery of admissible evidence." Degen v. United States, 517 U.S. 820, 825–26 (1996) (internal quotation mark omitted). Information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Because "[m]utual knowledge of all the relevant facts ... is essential to proper litigation ... either party may compel the other to disgorge whatever facts he has in his possession." Hickman, 329 U.S. at 507.   But "discovery, like all matters of procedure, has ultimate and necessary boundaries." Id. The Taylors have been honorable and patient litigants, never pestering the Court to complain about every nit and noid that arises. Their requests for production were legitimate and brought in good faith seeking to secure only the documents necessary to support their claims. To be sure, this was no fishing expedition by the Taylors and they should not have been denied discovery.  Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman, 329 U.S. at 507. The Defendant has admitted under oath that it has the documents requested by the Taylors. Any burden brought about by having to produce them must be viewed as outweighed by the benefit of obtaining a full and accurate understanding of the facts in the pursuit

of a just result. *See* <u>Bell v. Swift & Co.</u>, 283 F.2d 407, 409 (5th Cir. 1960) ("The [discovery] rules are in the interest of the administration of justice and transcend in importance mere inconvenience to a party litigant.").

WHEREFORE, Plaintiffs HOWARD L. TAYLOR, SR. and SONYA R. TAYLOR request an Order denying Defendant, Farm Credit of Northwest Florida, ACA's Motion for Summary Judgment. Alternatively, Plaintiffs request an Order deferring ruling on Defendant's Motion for Summary Judgment, reopening discovery to compel Defendant to produce the documents requested under Plaintiffs' Second Request for Production and allowing the taking or retaking of depositions based on evidence discovered.

## <u>RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs, HOWARD L. TAYLOR, SR. and SONYA R. TAYLOR, respond in opposition to Defendant, FARM CREDIT OF NORTHWEST FLORIDA ACA's, Motion for Summary Judgment [Doc. No. 49] and say:

### INTRODUCTION

The Defendant has moved for summary judgment on all claims, alleging that the undisputed material facts show that the Taylors: 1) cannot establish that they were qualified for the loan sought from Defendant; 2) cannot identify comparators who were treated more favorably; 3) cannot establish discriminatory animus; 4)

cannot establish damages; and 5) cannot obtain relief because the loan transaction is not governed by Chapter 760.20 *et seq*. Florida Statutes. …" [Doc. No. 49]. As briefed above, the Taylors assert that Rule 56(d) applies to the Defendant's motion, *in toto*, the Taylors bifurcate and respond as set forth below rather risk partial summary judgment entered against them based on a finding that *some* portions of the Defendant's motion did not fall under the ambit of Rule 56(d).

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Defendant, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which it has the burden of proof—that a genuine dispute of material fact exists—the moving party is entitled to summary judgment. Celotex Corp., 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the

evidence and making credibility determinations of the truth of the matter...the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998–99 (11th Cir. 1992) (internal citations and quotations omitted). An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party." Miccosukee Tribe of Indians of Florida v. United States, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting Anderson, 477 U.S. at 247–48). A fact is material if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 247–48). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. A self-serving and uncorroborated affidavit can create a genuine dispute of material fact (United States v. Stein, 881 F.3d 853, 858 (11th Cir. 2018)), but "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." Glasscox v. Argo, City of, 903 F.3d 1207, 1213 (11th Cir. 2018). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989, 996 (11th Cir. 1990).

Genuine issues of material facts exist such that the Defendant has not carried its burden and is not entitled to summary judgment. In addition, for those issues identified below for which the Taylors cannot formulate a response because of the unavailability of facts, the Taylors incorporate the facts and argument of their Fed. R. Civ. P. 56(d) motion, above, into this response in opposition.

## DEFENDANT'S ARGUMENT

### B. The Taylors Cannot Establish Discrimination Via Statistics

The Defendant's argument here is difficult to discern. The Defendant alleges that to prove discriminatory intent based on "statistics alone", the statistics must be statistically significant in the mathematical sense and then cites to the same case cited by the Court in Doc. No. 27. The problem with this argument is threefold. <u>First</u>, the cited case is a pattern and practice case which stands for the proposition that to establish a plausible inference of discriminatory intent under § 1981 <u>by using statistics alone</u>, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely. <u>Burgis v. New York City Dept. of Sanitation</u>, 798 F.3d 63 (2d Cir. 2015). The record is devoid of any evidence that that is what the Taylors are attempting to do. Statistics may be used under the <u>McDonnell Douglas</u> construct to support a finding of pretext. <u>Mitchell v. Sch. Bd. of Palm Beach County, Florida</u>, 19-CV-

81534, 2021 WL 1381325 (S.D. Fla. Mar. 25, 2021), <u>report and recommendation a</u><u>dopted,</u> 19-CIV-81534-RAR, 2021 WL 1381257 (S.D. Fla. Apr. 12, 2021)    citing <u>Roberson v. Snow</u>, 404 F. Supp. 2d 79 (D.D.C. 2005) and <u>Cook v. Boorstin</u>, 763 F.2d 1462 (D.C. Cir. 1985). Similarly, nothing prevents statistics as part of the convincing mosaic of circumstantial evidence under <u>Lewis v. City of Union City,</u> <u>Georgia</u>, 934 F.3d 1169, 1185 (11th Cir. 2019). Likewise, statistics could be included in the additional evidence discussed in <u>Anderson v. Wachovia Mortg.</u> <u>Corp.</u>, 621 F.3d 261 (3d Cir. 2010) and <u>BNT Ad Agency, LLC v. City of</u> <u>Greensboro</u>, 837 Fed. Appx. 962 (4th Cir. 2020). As the Court noted in it Order [Doc. No. 27], which was rendered before the Taylors' second amended complaint which alleged even more facts and statistics, "If the Taylors relied on these statistics alone, I would have no trouble concluding that it was not enough. … But the figures here were accompanied by other facts that – taken all together – nudged things across the line. Again, just barely." The Defendant next argues that the Taylors have no "admissible record evidence" of any statistics that establish the Defendant's "discriminatory animus". The Defendant is wrong. The Taylors alleged that between January 1, 2010 and May 4, 2020, the Defendant loaned:

> "$346,560,713 to borrowers where the loans were secured by real estate mortgages. The loans were made to 2011 white or white owned business borrowers and <u>38</u> black or black owned business borrowers. The <u>2011</u> white borrowers borrowed $339,881,949 (98.07% of the total amount loaned) while the <u>38</u> black borrowers borrowed $2,320,370 (.67% of the total amount loaned).

[Doc No. 30:22].

In it answer, the Defendant denied this allegation. However, when asked in deposition about its specific denial to this allegation in its answer, the Defendant admitted that it had no facts or documentation evidencing that the allegation was false, nor did it have any documents supporting the contention that the allegation was false. [Doc. No. 48-9:83, 84-86]. Those answers on behalf of the Defendant bind the Defendant and establish that the Defendant has no defensible basis for challenging the Taylors statistical allegations. This is both a genuine issue and a material fact that is in dispute. The Defendant then objects to the Taylors' lack of expert testimony on statistics and the lack of statistical analysis. As has been hashed and rehashed from the outset, The statistics alleged by the Taylors are one-half of the picture. Only the Defendant has the information to complete the picture and it has refused to produce the information. Only when that information is produced and analyzed can the statistical analysis be performed by the Taylors' expert. The cases cited by the Defendant in support of their argument on this actually support the Taylors' position here and in their Rule 56(d) motion, above, in that until the Defendant produces the information it admitted it has on hand, it remains unknown how blacks and other minority applicants were treated by the Defendant. What is known, though, is that the Defendant admitted that it has no evidence to rebut the

Taylors' statistical allegations, no matter how flawed or meritless the Defendant believes they are.

### C. The Taylors Cannot Establish a Prima Facie Claim Under McDonnell Douglas
### i. The Taylors Cannot Identify a Valid Comparator

For the reasons set forth above in their Fed. R. Civ. P. 56(d) motion, the Taylors admit that they cannot identify a valid comparator because the Defendant has refused to produce the any information or a single document which would allow the Taylors to at least attempt to locate comparator evidence. Moreover, in denying the Taylors' Motion to Compel [Doc. No. 45] after the discovery cutoff, the Court foreclosed any opportunity the Taylors may have had to locate any comparator evidence. That said, the Court found in its Order  [Doc. No. 27] that the comparators that the Taylors *identified at the pleading stage* helped nudge the Court into a finding of plausibility. The remainder of the Defendant's argument on this point is misguided.

Troubling, the Defendant has misrepresented the Taylors' discovery responses regarding comparators. Simply, the Defendant raised an issue regarding a response to an interrogatory which, at best, was ludicrous. Aside but important, the interrogatory and the Taylors' response was directed at the Taylors' amended complaint which, as the Court knows, was superseded by the Taylors' second amended complaint which the Defendant answered. Notwithstanding, the Defendant

believed that the Taylors waived all of their claims because "they do not contend that similarly situated individuals were treated differently by the Defendant." That is not what the Taylors said. In the abundance of caution, the Taylors supplemented their interrogatory response to make abundantly clear  the import of their original response. Exhibit D.

### ii. The Taylors fail to identify the decision-maker who was aware of any comparators

For the reasons set forth above in their Fed. R. Civ. P. 56(d) motion, the Taylors admit that they cannot identify a valid comparator, or a decision-maker who was aware of any comparators,  because the Defendant has refused to produce the any information or a single document which would allow the Taylors to at least attempt to locate comparator evidence. Moreover, in denying the Taylors' Motion to Compel [Doc. No. 45] after the discovery cutoff, the Court foreclosed any opportunity the Taylors may have had to locate any comparator evidence.

### iii. The Taylors cannot show they were qualified for the loan

The Defendant cites only two reasons supporting its contention that the Taylors were not qualified for the loan. The Defendant cites the Taylors' bankruptcy as the first reason. In support, the Defendant analogizes between its lending policy and the "identical polic[y]" of its sister institution, Farm Credit of Southwest Georgia ("SWG"), and says that the reason the Taylors' loan was denied there was because of bankruptcy. That is untrue and not supported by the record. During his

deposition, Tarrell Bennett, a 49 year employee, current chief lending officer of

SWG who had "held just about every position there is in the Association from time

to time" was specifically asked about the effect of the bankruptcy on the Taylors'

original loan request (which was transferred to the Defendant and denied) and on

their second loan request (which SWG approved after the Defendant denied the

Taylors' original loan request):

> Q   I will ask you one quick question about these two documents again.  Is it
> your understanding from exhibit 2 and 3 that the reason that the Taylors were
> denied was the existence of a bankruptcy?
> A   That's the reason that's on the exhibits.
> Q   Okay.  We established earlier on that the Taylors are current customers of
> Southwest Georgia of the loan you said you worked on.  What changed?  Let
> me withdraw.  They applied for the first loan, apparently they were denied
> because bankruptcy existed.  Did the bankruptcy disappear?
> A   No.
> Q   It still existed then at the time of the second loan?
> A    I am not sure.  I am not sure whether it had been discharged, I don't
> remember whether it had been discharged, or whether it was prior to discharge.
> I don't remember that sequence of events.
> Q    But to your knowledge, working on their second loan, do you have any
> reason to believe that the bankruptcy was off of their credit history?
> A   No.

[Doc. 48-5:19-2-24]

> Q   Understood, okay.  When you were working with the Taylors, did you find
> them to be responsive to all Southwest Georgia's requests?
> A   Very.
> Q   Did you find them to be honest?
> A   Yes.
> Q   Are they timely honoring their pending obligations?
> A   Very.
> Q   Did they ever explain their bankruptcy to you?
> A   They did.

Q   Did you believe them?

A   I did.

Q   Have you ever made loans to borrowers that have had bankruptcies in the past?

A   I have.

Q   So bankruptcies, then, are not an automatic exclusion, at least as far as Southwest Georgia; is that accurate?

A   I would say the answer to that would be partially depending on the Chapter or the bankruptcy that they filed.  A reorganization type bankruptcy that I think was what they filed, a Chapter 13, I think is what they filed.  We take the position that if they have reestablished credit, good credit after the bankruptcy, or during the bankruptcy and after the bankruptcy, we will consider a loan.

Q   Okay.  And I guess it's fair to say that because the Taylors ultimately got a loan, that they established their good credit after the bankruptcy, enough to satisfy Southwest Georgia?

A   That, along with the explanation of why they filed bankruptcy in the first place, the most recent
bankruptcy.

Q   In your experience as an underwriter and a lending officer and chief lending officer, have you ever had a situation where you have used the existence of a bankruptcy that is 30 years old to deny someone credit?

A   Not to my memory.

[Doc. 48-5:23-8-25; 24-1-25; 251-4]

On cross, Defendant's counsel attempted to lock Mr. Bennett into the bankruptcy response, but was unable to.

Q   Why was the initial loan decision upheld after the Credit Review Committee convened?

A   Because there was no reason to change the decision.

Q   Is that because the bankruptcy was still on their record?

A   I don't know.

Q   You sat on the committee that made the decision, correct?

A   That's correct, that upheld the original decision, because there was no reason to change the
decision.

Q   Why was there no reason to change the decision?

A   The committee makes its determination based on the information that had already been presented.

MR. KENDRICK:  (Indicating.)

THE WITNESS:  Ask me that, again, please.

BY MS. BOYD:

Q    Did the attorney just provide you with information that would give you a different answer?

MR. KENDRICK:  No, I wanted him to tell y'all whether he knew during that time period that the Taylors lost their deal they had applied for through Northwest Florida.  When did he know that. I think there is something off within the record, and if that is something I could assist him with. And he may not have known.

THE WITNESS:  I did know.  And because of that, there was no reason to -- that loan could not be made as requested, because the property that was applied for was no longer available to purchase.

[Doc. 48-5:30-16-25;31-1-22]

The Defendant has also misstated the record concerning Janus, one of the

three lenders specializing in agricultural loans. Janus, contrary to the Defendant's

assertion, did not deny the Taylors' loan application because of bankruptcy:

**Q · · So it's my understanding Janus denied your · ·loan because of your bankruptcy; is that right?**

A · · No. · She said I had to wait another three or ·four months for it to clear.

**Q · · Because you couldn't get the underwriting ·because of the bankruptcy; correct?**

A · · The criteria called for 48 months to be ·discharged, but everything else looked good. · And if I ·wanted to continue after those months, we could.

**Q · · As of June 2019, Janus told you they could not make the loan because of your bankruptcy; correct?**

A · · I disagree with that, because in another three or four months that wouldn't have been an issue.

**Q · · I'm not asking about three or four months later. · In June of 2019, Janus Mortgage could not make your loan because of your bankruptcy; correct?**

A · · I disagree.

[Doc. No. 48-1:218-24-25; 219-1-15]

While it is undisputed that the Taylors' had a bankruptcy on their record, the record evidence shows that neither of the lenders cited by the Defendant denied the Taylors' loan application because of bankruptcy.

The second reason the Defendant gives in support of the Taylors not being qualified for the loan is "the Taylors failed to meet other Farm Credit underwriting criteria that would allow for an exception." Even if the Taylors understood what the Defendant was saying here, which they do not, the allegation is insufficient to require a response. When the *nonmoving* party, here the Taylors, has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material *negating* the opponent's claim," Celotex Corp., 477 U.S. at 323, in order to discharge this "initial responsibility." Instead, the moving party simply may " 'show[ ]'—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. 317. at 324, 106 S.Ct. at 2554. In the Eleventh Circuit, though, "[e]ven after *Celotex,* it is never enough simply to state that the non-moving party cannot meet its burden at trial." Clark, 929 F.2d 604; Celotex Corp., 477 U.S. at 328 (White, J., concurring) ("it is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case"). Simply saying that the Taylors failed to meet

underwriting criteria doesn't carry the Defendant's burden. Instead, the moving party must point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial. *Id.* at 325, 106 S.Ct. at 2553 ("a party seeking summary judgment always bears the initial responsibility ... of *identifying those portions* of the materials on file which demonstrate the absence of a genuine issue of material fact" (emphasis added)).

### iv. The Taylors cannot show any evidence of pretext

Like the above assertion, the Taylors can make no sense of this argument. Likewise, the Defendant's case citations do not remotely stand for the propositions loosely advanced. The Am Dental case is a RICO and Racketeering case dealing with the pleading standard under Twombly about whether factual allegations were sufficiently pled under Fed. R. Civ. P. 9(b). Likewise, the Molina case has absolutely nothing to do with evidence of pretext or burden shifting. In fact, the word "pretext" does not appear anywhere in the case, let alone at the pin citation. Absent any legal authority whatsoever, and for the reasons set forth directly above, the Defendant's allegations here cannot satisfy its burdens on summary judgment.

### D. The Taylors cannot show a convincing mosaic of discrimination

With nothing further than recitation of the law, the Defendant next alleges that the Taylors cannot satisfy the alternative McDonnell Douglas framework under Lewis v. City of Union City, Georgia, 934 F.3d 1169, 1185 (11th Cir. 2019). Like

the two immediately above arguments, the Defendant cannot carry its burden on summary judgment merely by saying that the Taylors cannot prove something. Clark, 929 F.2d 604; *see also* Celotex Corp., 477 U.S. at 328 (White, J., concurring) ("it is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case"). The Defendant has repeated the requirement that a decision-maker is required for an intentional discrimination case, the Taylors almost began believing it. Lewis has no requirement that a decisionmaker be identified as part and parcel of the "convincing mosaic" construct. Instead, Lewis stands for the proposition that:

> "Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator simply may not exist in every work place. Accordingly, a "plaintiff will always survive summary judgment if he presents ... 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.' " *Id.* (quoting Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 734 (7th Cir. 2011), overruled by Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016) (footnote omitted)). A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. Silverman, 637 F.3d at 733–34 (quotations omitted).

To boot, the Defendant goes back to terms such as "similarly situated borrowers" "pretext" "protected class" concluding with the assertion that the Taylors cannot

prove "a plausible prima facie case of racial discrimination." Indeed, the Taylors are not bound to establish a convincing mosaic under Lewis if they are able to identify suitable comparator evidence. The Taylors' present inability to present comparator evidence has been briefed above in the Taylors' Rule 56(d) motion. The Defendant has provided no case which designates what types of evidence would comprise a convincing mosaic of evidence under a lending discrimination case under the ECOA and § 1981. Imaginably, some circumstantial evidence could be the disparate lending statistics the Defendant admitted; that the key decisionmaker and CEO (who had the final say-so over the loan approval) admitted at deposition to making offensive racial comments [Doc. No. 48-11:47-48] which had the effect of making the Taylors feeling demeaned, angry, the butt of a joke to the point of saying that "Because its [discussing irrelevant topics that carry racial overtones such as Terry's discussion of chitlins and collard greens] demeaning. It's used in way to demean people. Its like --I was saying. I think is a way its worse than calling me the N word. I would prefer (talkover) to call me a nigger. I really would have." [Doc. 48-1:292-11-18]. Other circumstantial evidence could be the manufactured credit scores, the increasing down-payments, and the inexplicable "ratios" which have never been explained by any witness or produced as loan or credit policy.

**E. The Taylors cannot establish discrimination under a mixed-motive theory**

The Taylors have not alleged a cause of action under the mixed motive theory and thus cannot respond other than to say that Richard Terry was the key decisionmaker, the CEO and Chairman of the Credit Review Committee. He testified that his committee had the authority recommend overturning the Taylors' loan denial. [Doc. No. 48-11:18-20-25]. Richard Terry, as the key decisionmaker also had final sign-off authority on the final determination of the Taylors' appeal. [Doc. No. 48-11:39 – 1-25].

### F. The Taylors claim under the FHA also fails because the loan applied for was for vacant property

§ 760.25, Fla. Stat. Ann. provides:

**760.25   Discrimination in the financing of housing or in residential real estate transactions.**—
(1)   It is unlawful for any bank, building and loan association, insurance company, or other corporation, association, firm, or enterprise the business of which consists in whole or in part of the making of commercial real estate loans to deny a loan or other financial assistance to a person applying for the loan for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him or her in the fixing of the amount, interest rate, duration, or other term or condition of such loan or other financial assistance, because of the race, color, national origin, sex, disability, familial status, or religion of such person or of any person associated with him or her in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or because of the race, color, national origin, sex, disability, familial status, or religion of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given.

(2)(a)   It is unlawful for any person or entity whose business includes engaging in residential real estate transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, national origin, sex, disability, familial status, or religion.

(b)    As used in this subsection, the term "residential real estate transaction" means any of the following:

1.    The making or purchasing of loans or providing other financial assistance:

a.    For purchasing, constructing, improving, repairing, or maintaining a dwelling; or

b.    Secured by residential real estate.

2.    The selling, brokering, or appraising of residential real property.

Likewise, § 760.22(5), Fla. Stat. Ann. defines a "dwelling" as: "Dwelling" means any building or structure, or portion thereof, which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location on the land of any such building or structure, or portion thereof.

The Defendant appears to say here that because the land being purchased by the Taylors was vacant, Chapter 760 does not apply. The Defendant is incorrect because the definition of a "dwelling" includes "any vacant land which is offered for sale or lease for the construction or location on the land of any such building or structure, or portion thereof." The Defendant was aware that the Taylors wanted to build their homestead on the land:

**Q·· Did you tell them that you wanted to do anything else with the property?**
A·· Just general -- general-type farming and homestead.· I'm sorry.· Of course homestead was the real big thing for me.
**Q·· Meaning you wanted to build a home on the property?**
A·· I wanted to build a home on it and be out by ourselves.
**Q·· Did you attempt to obtain a construction loan as part of the financing?**
A·· No.
**Q·· What did you tell Northwest Florida about what you wanted to do with the property?**
A·· I told them the same thing I told Georgia, I mean, what we were attempting to do with the property and so forth.

[Doc. 48-1:206]

33

### G. The Taylors cannot establish damages under any theory

The Defendant is incorrect. As an initial matter, under the ECOA it is not necessary to prove actual damages to be entitled to relief. Cherry v. Amoco Oil Co., 490 F. Supp. 1026 (N.D. Ga. 1980) ("The Act did not envision the necessity of proof of actual damages as a prerequisite to entitlement to punitive damages, equitable or declaratory relief, or attorney's fees. Section 1691e(d) provides that "in the case of any successful action under subsection (a), (b), or (c) of this section, the cost of the action, together with a reasonable attorney's fee as determined by the Court, shall be added to any damages awarded by the court under such subsection.");  Slicker v. Jackson, 215 F.3d 1225 (11th Cir. 2000) ("We add, however, that even if Slicker were unable to demonstrate that he suffered any actual injury, under controlling case law the district court erred in not allowing Slicker to seek nominal damages. We have held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury. See Kelly v. Curtis, 21 F.3d 1544, 1557 (11th Cir. 1994)(holding that a § 1983 plaintiff alleging false arrest, malicious prosecution, and illegal detention is entitled to receive nominal damages if he demonstrates that the defendants violated his constitutional rights even if he is unable to prove that he suffered a specific, actual injury as a result of the defendants' conduct); Carey v. Piphus, 435 U.S. 247, 266 (1978).") Thus, the Taylors can

establish damages in any event as a matter of law. Beyond that, though, Howard Taylor gave extensive testimony in his deposition of the damages he suffered as a result of losing the land because the loan was improperly denied by the Defendant. The damages, which he is qualified and permitted to testify to under <u>Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.</u>, 320 F.3d 1213 (11th Cir. 2003) include compensatory, economic and non-economic damages in the form of emotional pain, suffering and distress. See generally [Doc. 48-1:beginning at 241].

WHEREFORE, Plaintiffs Howard L Taylor Sr. and Sonya R. Taylor request an Order denying Defendant, Farm Credit of Northwest Florida ACA's Motion for Summary Judgment and for such other relief deemed necessary and proper.

Dated:  August 2, 2021

Respectfully submitted,
BERGER SINGERMAN LLP
*Attorneys for Plaintiffs*

 /s/ *Joseph P. Jones*
Joseph P. Jones, Esq.
Florida Bar No. 0191604
Terron L. Clark, Esq.
Florida Bar No. 104944
Michael J. Niles, Esq.
Florida Bar No. 107203
313 North Monroe Street, Suite 301
Tallahassee, Florida 32301
(850) 510-3010
and
1450 Brickell Ave., Suite 1900
Miami, FL 33131
(305) 755-9500

35

jjones@bergersingerman.com
mniles@bergersingerman.com
tclark@bergersingerman.com
Drt@bergersingerman.com

## CERTIFICATION OR WORD LIMIT

**I HEREBY CERTIFY** that this Response in Opposition and Rule 56(d)

Motion and Incorporated Memorandum of Law, inclusive of the case style, signature

block and certificate of service contains 4,696 words.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 2, 2021 the foregoing was served
electronically through the Court's CM/ECF system upon all parties on the attached
Service List.


  /s/ *Joseph P. Jones*
Joseph P. Jones, Esq.

## SERVICE LIST

Ginger Barry Boyd (FBN 0294550)
John F. Loar (FBN 110386)
**NELSON MULLINS BROAD AND CASSEL**
215 South Monroe Street, Suite 400
Tallahassee, Florida 32301
Telephone: (850) 681-6810
ginger.boyd@nelsonmullins.com
john.loar@nelsonmullins.com